# EXHIBIT 2



CJ19 4561 -

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY** Stallings
**STATE OF OKLAHOMA**

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

AUG 1 6 2019

RICK WARREN
COURT CLERK
00_____

| | |
|---|---|
| BOARD OF COUNTY COMMISSIONERS OF OKLAHOMA COUNTY, | |
| Plaintiff, | Case No. |
| v. | **CJ-2019-4561** |
| (1) MCKESSON CORP.,<br>(2) CARDINAL HEALTH, INC.,<br>(3) AMERISOURCEBERGEN CORP.,<br>(4) MORRIS & DICKSON CO, LLC,<br>(5) CVS HEALTH CORP.,<br>(6) CVS PHARMACY, INC.,<br>(7) OKLAHOMA CVS PHARMACY, LLC<br>(8) WALGREENS BOOTS ALLIANCE, INC. a/k/a<br>   WALGREEN CO.,<br>(9) WAL-MART INC. f/k/a WAL-MART<br>   STORES, INC.,<br>(10) GPC PHARMA, LLC<br>(11) KALCHEM INTERNATION, INC.<br>Defendants. | **PETITION** |

## INTRODUCTION

1.      In 2017, the United States saw a record number of drug overdose deaths; totaling 72,000 people and an approximate ten percent increase from 2016. The 2017 drug overdose death toll is higher than the peak annual death totals for HIV, car wrecks. or gun deaths. Analysts pointed to the opioid epidemic ravaging communities across the country (growing number of opioid users) and prescription opioids becoming deadlier. The opioid epidemic has been particularly devastating in Oklahoma and Oklahoma County as a result of corporate greed.

2.      Oklahoma County employees hundreds of people and is responsible for funding medical insurance plans for its employees. This includes hundreds of county

employees who are employed by the Oklahoma County Sheriff's Office and Oklahoma County Jail. Oklahoma County provides a wide range of services to its residents, including expending numerous direct costs and various resources on battling the opioid epidemic through the criminal justice system.

3.      Oklahoma County brings this action in its own legal capacity to protect the health, safety, and welfare of all its residents.

4.      Opioids are highly addictive and, historically, medical professionals have prescribed them in limited circumstances to patients with cancer, terminal illnesses, or acute short-term pain. Prescription opioid manufacturers market and sell opioids while Defendants distribute opioids and, therefore, the limited uses for which medical professionals prescribed opioid prescriptions undermined Defendants' ability to maximize profits. Thus, Defendants sought to maximize their profits by distributing as many opioids as possible without willful ignorance to the outrageous amount of opioids flowing into Oklahoma communities.

5.      Upon information and belief, Oklahoma County has been overwhelmed by the devastation from opioid addiction and its costs to provide a wide range of social services, from child welfare to law enforcement, have substantially increased. The result has been that virtually every family in Oklahoma County has personally experienced or knows someone who has been adversely impacted by the opioid epidemic.

6.      These costs and adverse effects of the opioid epidemic could have been, and should have been, prevented by Defendants. The prescription drug industry is required to secure and monitor opioids at every step in the stream of commerce, thereby protecting opioids from theft, misuse, and diversion. The industry is required to

2

implement and follow processes that stop suspicious or unusual orders by pharmacies, doctors, clinics, or patients.

7.      Instead of acting with reasonable care and in compliance with their legal duties, Defendants intentionally and/or recklessly saturated communities with opioids and pocketed billions of dollars in the process.

8.      As a direct result of Defendants' actions, not only have residents of Oklahoma County committed criminal acts to obtain opioids, but also physicians and pharmacists themselves in order to make the most money possible from opioid-related enterprise. Defendants created an environment where physicians and pharmacists sought to profit at the expense of their patients and customers who would become addicted to opioids at the expense of Oklahoma County.

9.      Defendants' actions directly and foreseeably caused damages to Oklahoma County, including but not limited to, actual costs, lost opportunity costs, healthcare and emergency care costs, costs for social services for those suffering from opioid addiction, overdose, or death; counseling, treatment and rehabilitation services; treatment of infants born with opioid-related medical conditions; welfare and foster care for children whose parents suffer from opioid-related disability or incapacitation; and law enforcement and public safety relating to the opioid epidemic within the County. Oklahoma County has also suffered substantial damages due to the lost productivity of its residents, increased administrative costs, and the lost opportunity for growth and self-determination. These damages have been suffered and continue to be suffered directly by Oklahoma County.

10.     Oklahoma County also seeks the abatement of the continuing epidemic created by Defendants' wrongful and/or unlawful conduct.

3

## II. THE PARTIES

### A. Plaintiff

11.     Oklahoma County is an organized county within the State of Oklahoma, a body corporate and politic, with the statutory authority and power to sue and be sued. Oklahoma County provides a wide range of services on behalf of its residents, including but not limited to social services for families and children, public health, public assistance, law enforcement and emergency care. Plaintiff is referred to as "Oklahoma County" or "County".

### B. Distributor Defendants

12.     MCKESSON CORPORATION ("McKesson") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in San Francisco, California.

13.     McKesson distributes prescription opioids to providers and retailers, including in Oklahoma. McKesson is registered to do business and receive service of process in Oklahoma. McKesson is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

14.     CARDINAL HEALTH, INC. ("Cardinal") is a publicly traded company incorporated under the laws of Ohio and with a principal place of business in Ohio.

15.     Cardinal distributes prescription opioids to providers and retailers, including in Oklahoma. Cardinal is registered to do business and receive service of process in Oklahoma. Cardinal is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

16.     AMERISOURCEBERGEN CORPORATION ("AmerisourceBergen") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in Pennsylvania.

17.     AmerisourceBergen distributes prescription opioids to providers and retailers, including in Oklahoma. AmerisourceBergen is registered to do business and receive service of process in Oklahoma.

18.     AmerisourceBergen is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

19.     MORRIS & DICKSON CO, LLC ("Morris") is a privately held company incorporated under the laws of Louisiana with its principal place of business in Louisiana.

20.     Morris distributes prescription opioids to providers and retailers, including in Oklahoma. Morris is registered to do business and receive service of process in Oklahoma. Morris is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma.

21.     CVS HEALTH CORPORATION is a Delaware corporation with its principal place of business in Rhode Island. CVS PHRMACY, INC. is a foreign for profit business corporation with its principal place of business in Rhode Island. OKLAHOMA CVS PHARMACY, LLC is a domestic limited liability company established under the laws of Oklahoma with its principal place of business in Oklahoma. CVS Health Corporation, CVS Pharmacy, Inc. and Oklahoma CVS Pharmacy, LLC are collectively known as "CVS". During all relevant times, CVS has sold and continues to sell prescription opioids in and around Oklahoma. CVS is also registered with the Oklahoma Department of Health as a wholesale prescription drug distributor in Oklahoma. At all

5

relevant times, CVS has distributed and continues to distribute prescription opioids in and around Oklahoma County.

22. WALGREENS BOOTS ALLIANCE, INC. also known as WALGREEN CO. ("Walgreens") is a Delaware corporation with is principal place of business in Illinois. At all relevant times, Walgreens has distributed and continues to distribute prescription opioids in and around Oklahoma County.

23. WAL-MART INC., formerly known as Wal-Mart Stores, Inc. ("Wal-Mart") is a Delaware corporation with its principal place of business in Arkansas. At all relevant times, Wal-Mart has distributed and sold and continues to distribute and sell prescription opioids in Oklahoma, including in and around the Oklahoma County.

24. GCP PHARMA, LLC ("GCP Pharma") was a privately held company incorporated under the laws of Oklahoma with its principal place of business in Oklahoma.

25. GCP Pharma distributed prescription opioids to providers and retailers, including in Oklahoma. GCP Pharma was registered to do business and receive service of process in Oklahoma. GCP Pharma was also registered with the Oklahoma State Board of Pharmacy as a wholesale prescription drug distributor in Oklahoma.

26. KALCHEM INTERNATIONAL, INC. was a privately held company incorporated under the laws of Oklahoma with its principal place of business in Oklahoma.

27. KALCHEM INTERNATIONAL, INC. distributed prescription opioids to providers and retailers, including in Oklahoma. Kalchem International, Inc. was registered to do business and receive service of process in Oklahoma. Kalchem

6

International, Inc. was also registered with the Oklahoma State Board of Pharmacy as a wholesale prescription drug distributor in Oklahoma

28.     Collectively, McKesson, Cardinal, AmerisourceBergen, M&D, CVS, Walgreens, Wal-Mart, GCP Pharma, and Kalchem International, Inc. are the "Distributor Defendants."

## III.   JURISDICTION AND VENUE

29.     This Court has jurisdiction over this action because Defendants conduct business in Oklahoma County and throughout Oklahoma and have deliberately engaged in significant acts and omissions within Oklahoma County that have injured its residents. Defendants purposefully directed their activities at Oklahoma County, including, but not limited to, distributing prescription opioids within Oklahoma County.

30.     Venue is proper in Oklahoma County, State of Oklahoma.

31.     This action is non-removable because there is incomplete diversity of residents, no substantial federal question presented, and a claim for the abatement of a public nuisance in Oklahoma County based on state law.

## IV.   ADDITIONAL FACTUAL BACKGROUND

### A.   Overview of National Opioid Epidemic

32.     Historically, opioids were considered too addictive and debilitating to be part of a long-term pain management regimen for chronic pain. Prior to the 1990s, the medical profession adhered to the standard that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer and end-of-life care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed

7

tolerance to opioids over time as well as the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, medical professionals generally did not prescribe opioids for chronic pain.

33.     Moreover, opioids also tend to induce tolerance, whereby a person who uses opioids repeatedly over time no longer responds to the drug as strongly as before, thus requiring a higher dose to achieve the same effect. This tolerance contributes to the high risk of overdose during a relapse for those addicted to opioids.

34.     Prescription opioid manufacturers engaged in conduct that directly caused medical professionals to unwittingly prescribe long-term and increased amounts of opioids to "aggressively" treat pain. Prescription opioid manufacturers did so to take advantage of a much larger and lucrative market for chronic pain patients.

35.     As a result of prescription opioid manufacturers' conduct, prescription opioids have become widely prescribed. By 2010, enough prescription opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[1] From 1999 to 2013, the amount of prescription painkillers prescribed and sold in the United States nearly quadrupled. Yet, there had not been an overall change in the amount of pain reported by patients.

36.     By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention ("CDC") declared prescription painkiller overdoses to be at epidemic levels. The press release noted:

> a. The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

---

[1] Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

8

b. More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin) and oxymorphone (Opana).

c. Overdoses involving prescription painkillers are at epidemic levels and now kill more Americans than heroin and cocaine combined.

d. The increased use of prescription painkillers for nonmedical reasons, along with growing sales, has contributed to a large number of overdoses and deaths. In 2010, 1 in every 20 people in the United States age 12 and older—a total of 12 million people—reported using prescription painkillers non-medically, according to the National Survey on Drug Use and Health. Based on the data from the Drug Enforcement Administration, sales of these drugs to pharmacies and health care providers have increased by more than 300 percent since 1999.

e. Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

f. Almost 5,500 people start to misuse prescription painkillers every day.[2]

37.     Many Americans, including residents of Oklahoma County, are now addicted to prescription opioids and the number of deaths due to prescription opioid overdose has reached epidemic levels. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22 percent over the 52,404 drug deaths recorded the previous year.[3] The President of the United States has declared the opioid epidemic a public health emergency.

---

[2] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011),
https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[3] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death- estimates.pdf.

9

38.     The National Institute on Drug Abuse identifies addiction to opioids as "a serious national crisis that affects public health as well as social and economic welfare."[4] The economic burden of prescription opioid misuse alone is hundreds of billions of dollars a year, including the costs of healthcare, lost productivity, addiction treatment and criminal justice expenditures.[5]

39.     Deaths from prescription opioids have quadrupled in the past 20 years and treatment admission and emergency room visits related to the abuse of opioids for non-medical use have also dramatically increased.

40.     According to the CDC,[6] opioid deaths and treatment admissions are tied to opioid sales.

41.     Defendants have fueled and exacerbated the epidemic by wholly ignoring the amount of opioids flowing into communities across the United States despite knowing that their wrongful and unlawful conduct was causing and continuing to cause the opioid epidemic.

## B.      Overview of Opioid Epidemic in Oklahoma and Oklahoma County

42.     Communities have been devastated by the opioid epidemic as a result of Defendants' distribution and/or diversion of opioids. Oklahoma is one of the leading states in prescription painkiller sales per capita, with 128 painkiller prescriptions

---

[4] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis, last visited Sept. 19, 2017) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P,  David F, Scholl L, Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015, *MMWR  MORB MORTAL WKLY REP*. 2016;65, doi:10.15585/mmwr.mm655051e1).
[5] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose,  Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906, doi:10.1097/MLR.0000000000000625).
[6] U.S. Dep't of Health & Human Servs., *Addressing Prescription Drug Abuse in the United States*, available at
https://www.cdc.gov/drugoverdose/pdf/hhs_prescription_drug_abuse_report_09.2013.pdf.

dispensed per 100 people in 2012. Drug overdose deaths in Oklahoma increased eightfold from 1999 to 2012, surpassing car crash deaths in 2009. In 2012, Oklahoma had the fifth-highest unintentional poisoning death rate and prescription opioids contributed to the majority of these deaths.

43.   In 2014, Oklahoma's unintentional poisoning rate was 107% higher than the national rate. Oklahoma had the 10th highest drug overdose death rate in the nation in 2014. Opioids are the most common class of drug involved in unintentional overdose deaths in Oklahoma.

44.   In 2015, 823 fatal drug overdoses occurred in Oklahoma, an almost 140% increase over 2001, with opioids contributing to the largest number of these deaths. As of 2015, there were more prescription drug overdose deaths each year in Oklahoma than overdose deaths from alcohol and all illegal drugs combined.

45.   In Oklahoma, more overdose deaths involved hydrocodone or oxycodone than methamphetamines, heroin, and cocaine combined.

46.   According to 2016 statistics, Oklahoma ranks number one in the nation in milligrams of opioids distributed per adult resident with approximately 877 milligrams of opioids distributed per adult resident.

47.   A National Survey on Drug Use and Health revealed Oklahoma leads the nation in non-medical use of painkillers, with nearly 5% of the population aged 12 and older abusing or misusing painkillers.

48.   From 2007-2013, there were 925 unintentional overdose deaths in Oklahoma County, which is an average of 11 deaths every month. Two of the most common substances involved in these deaths were oxycodone and hydrocodone. Roughly

11

60% of the deaths involved a prescription painkiller and adults age 35-54 had the highest rate of unintentional poisoning death.

49. From 2012-2016, there were 732 unintentional overdose deaths in Oklahoma County. Of those deaths, 401 were the result of prescription painkillers. Again, two of the most common substances in the overdose deaths were oxycodone and hydrocodone.

50. The Oklahoma County Sheriff's Department now carries Naloxone and/or Narcan, antidotes to opioid overdose, and uses them virtually on a daily basis to save the lives of Oklahoma County residents.

51. The Defendants' saturation of communities with prescription opioids has created accessibility and availability of prescription opioids, which is fueling illicit opioid addiction. According to the CDC, past misuse of prescription opioids is the strongest risk factor for a person starting and using heroin. Between 2000 and 2014, the number of overdose deaths from heroin nationwide quintupled.

52. Defendants' conduct is affecting even Oklahoma County's youngest and most vulnerable citizens. The national rate of babies born with neonatal abstinence syndrome ("NAS"), a group of conditions newborns experience when withdrawing from exposure to drugs like opioids, increased fivefold from 2000 to 2012. In 2014, the number of newborns testing positive for prescription medications doubled the number reported in 2013.

12

### A. Defendants' Unlawful Distribution Of Opioids

53. In addition to common law duties to exercise reasonable care under the circumstances[7], the Distributor Defendants owe a duty under state law to monitor, detect, investigate, refuse to fill, and report suspicious orders of prescription opioids originating from Oklahoma County as well as those orders which the Distributor Defendants knew or should have known were likely to be diverted into Oklahoma County. *See* 63 O.S. Chapter 2 (Oklahoma Uniform Controlled Dangerous Substances Act, hereinafter "Oklahoma CSA").

54. The Oklahoma CSA creates a legal framework for the distribution and dispensing of opioids in Oklahoma. It is a system of checks and balances throughout the entire supply chain of opioids and requires every person or entity that manufactures, distributes, or dispenses opioids to obtain "registration" with the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control. Registrants at every level of the supply chain must fulfill their obligations under the Oklahoma CSA; otherwise there is an overwhelming risk of harm to Oklahoma County.

55. Pursuant to the Oklahoma CSA and the Oklahoma Administrative Code, all opioid distributors are required to maintain effective controls against opioid diversion. Defendant Distributors must create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders can include orders of unusual size, orders that deviate from usual ordering patterns, and/or unusual frequency of orders. Thus, at a minimum to comply with these requirements,

---

[7] This includes a duty not to create a foreseeable risk of harm to others, but also a duty to exercise reasonable care to prevent threatened harm after engaging in affirmative conduct and either realizing or should realize that such conduct has created an unreasonable risk of harm to another.

13

Defendant Distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of potential diversion.

56.     Oklahoma law also creates a distribution monitoring system for controlled substances and requires distributor and dispensers of controlled dangerous substances to keep records and maintain inventories.

57.     Similarly, the Oklahoma administrative code requires anyone who distributes or dispenses prescription opioids to inform the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control of suspicious orders when discovered. The code also requires reporting of theft or any significant loss of any controlled dangerous substances upon discovery of such theft or loss.

58.     The foreseeable harm from a breach of these duties is the diversion of prescription opioids for nonmedical purposes.

59.     Each Distributor Defendant repeatedly and purposefully breached its duties under common law and state law. Such breaches are direct and proximate causes of the widespread diversion of prescription opioids for nonmedical purposes into Oklahoma County.

60.     The unlawful diversion of prescription opioids is a direct and proximate cause of the opioid epidemic, prescription opioid abuse, addiction, morbidity and mortality in Oklahoma County. This diversion and the epidemic are direct causes of harms for which Plaintiff seeks to recover here.

61.     The opioid epidemic in Oklahoma County remains an immediate *hazard to public health and safety*.

14

62.     The Distributor Defendants' intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms and damages alleged herein.

63.     The DEA has provided guidance to distributors to combat opioid diversion. On information and belief, since 2006 the DEA has conducted one-on-one briefings with distributors regarding downstream customer sales, due diligence, and regulatory responsibilities. The DEA also provides distributors with data on controlled substance distribution patterns and trends, including data on the volume and frequency of orders and the percentage of controlled versus non-controlled purchases. On information and belief, the DEA has also hosted conferences for opioid distributors and has participated in numerous meetings and events with trade associations.

64.     On September 27, 2006, and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring and the responsibilities and obligations of registrants to prevent diversion.

65.     As part of the legal obligation to maintain effective controls against diversion, the distributor is required to exercise due care in confirming the legitimacy of each and every order prior to filling. Circumstances that could be indicative of diversion include ordering excessive quantities of a limited variety of controlled substances while ordering few if any other drugs; ordering a disproportionate amount of controlled substances versus non-controlled prescription drugs; ordering excessive quantities of a limited variety of controlled substances in combination with lifestyle drugs; and ordering the same controlled substance from multiple distributors.

15

66. Suspicious orders must be reported when discovered. Registrants must perform an independent analysis of a suspicious order prior to the sale to determine if the controlled substances would likely be diverted, and filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility.

67. On information and belief, the Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" emphasizing the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

68. Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibilities to prevent diversion. They have made statements assuring the public they are supposedly undertaking a duty to curb the opioid epidemic.

69. These assurances, on their face, of identifying and eliminating criminal activity and curbing the opioid epidemic create a duty for the Distributor Defendants to take reasonable measures to do just that.

70. Despite their duties to prevent diversion, the Distributor Defendants have knowingly or negligently allowed diversion.[8] The DEA has repeatedly taken action to

---

[8] Scott Higham and Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, Wash. Post, Oct. 15, 2017, available at https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/?utm_term=.75e86f3574d3; Lenny Bernstein, David S. Fallis, and Scott Higham, *How drugs intended for patients ended up in the hands of illegal users: 'No one was doing their job,'* Wash. Post, Oct. 22, 2016, available at https://www.washingtonpost.com/investigations/how-drugs-intended-for- patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their- job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?tid=graphics- story&utm_term=.4f439ef106a8.

attempt to force compliance, including 178 registrant actions between 2008 and 2012, 76 orders to show cause issued by the Office of Administrative Law Judges, and 41 actions involving immediate suspension orders.[9] The Distributor Defendants' wrongful conduct and inaction have resulted in numerous civil fines and other penalties, including:

 a. In a 2017 Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150,000,000.[10]

 b. McKesson has a history of repeatedly failing to perform its duties. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the Country, resulting in millions of doses of controlled substances being diverted. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer.

 c. On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion.

 d. On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

 e. On December 7, 2007, the DEA issued an Order to Show

---

[9] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), available at https://oig.justice.gov/reports/2014/e1403.pdf.

[10] Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), available at https://www.justice.gov/opa/press-release/file/928476/download .

Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion.

f. On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion.

g. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States.[11]

h. On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion.

i. In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states.

j. In December 2016, the Department of Justice announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act.[12]

k. On information and belief, in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year.

l. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it

---

[11] Lenny Bernstein and Scott Higham, *Cardinal Health fined $44 million for opioid reporting violations*, Wash. Post, Jan. 11, 2017, available at https://www.washingtonpost.com/national/health-science/cardinal-health-fined-44- million-for-opioid-reporting-violations/2017/01/11/4f217c44-d82c-11e6-9a36-1d296534b31e_story.html?utm_term=.0c8e17245e66.

[12] Press Release, United States Dep't of Justice, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act*, Dec. 23, 2016, available at https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million- settlement-alleged-violations-controlled-substances-act.

18

was not controlling shipments of prescription opioids to Internet pharmacies.

m. In 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.

n. In May of 2018, M&D was ordered to cease sales of opioids, alleging that the company failed to report unusually large narcotics shipments to drugstores. M&D had distributed excessive amounts of opioids to five of the top 10 pharmacies purchasing narcotics in Louisiana. In some cases, M&D allowed independent pharmacies to purchase six times the quantity of narcotics than they would normally order from the distributor. Despite receiving these excessively large orders, M&D never filed a suspicious activity report on any of the drugstores in question.

o. In 2013, CVS agreed to pay $11 million to the United States to settle civil penalty claims for record-keeping violations over a six-year period in the United States District Court for the Western District of Oklahoma. The violations included filling prescriptions for prescribers whose registration numbers were not current or valid, entering and maintaining CVS dispensing records in which non-prescribing practitioners were substituted for registration numbers of prescribing practitioners and creating, entering and maintaining invalid "dummy" registration numbers of prescribing practitioners that were provided to the Oklahoma prescription drug monitoring program.

p. In 2013, Walgreens agreed to pay $80 million in civil penalties related to allegations of record-keeping and dispensing violations. The allegations accused Walgreens of endangering public safety in that it allowed millions of controlled substances, including oxycodone, to reach the black market. Walgreens was barred from shipping oxycodone and other controlled drugs from its Jupiter, Florida distribution center.

71. Although law enforcement authorities have penalized distributors, these penalties have not changed their conduct. Distributor Defendants' pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

72.     The Distributor Defendants' failure to prevent the foreseeable injuries from opioid diversion created an enormous black market for prescription opioids, which extended to Oklahoma County. Each Distributor Defendant knew or should have known that the opioids reaching Oklahoma County were not being consumed for medical purposes and that the amount of opioids flowing to Oklahoma County was far in excess of what could be consumed for medically necessary purposes.

73.     The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor would have anticipated the danger of opioid diversion and protected against it by, for example, taking greater care in hiring, training, and supervising employees; providing greater oversight, security, and control of supply channels; looking more closely at the pharmacists and doctors who were inappropriately prescribing commonly-abused opioids; investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Oklahoma County; providing information to pharmacies and retailers about opioid diversion; and in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

74.     On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing the areas around Oklahoma County to perform due diligence inspections to ensure that the controlled substances the Distributor Defendants had furnished were not being diverted to illegal uses.

75.     On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales

of opioids to pharmacies and other facilities servicing the areas around Oklahoma County, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

76.     It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the market in and around Oklahoma County with highly addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

77.     It is reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death. It is also reasonably foreseeable that many of these injuries will be suffered by the residents of Oklahoma County, and that the costs of these injuries will be borne by Oklahoma County.

78.     The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic faced by Oklahoma County, and would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

79.     The Distributor Defendants were aware of widespread prescription opioid abuse in and around Oklahoma County, but, on information and belief, they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas in such quantities, and with such frequency that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

21

80.     The use of opioids by residents of Oklahoma County who were addicted or who did not have a medically necessary purpose could not occur without the knowing cooperation and assistance of the Distributor Defendants. If the Distributor Defendants adhered to effective controls to guard against diversion, the residents of Oklahoma County and Oklahoma County would have avoided significant injury.

81.     The Distributor Defendants made substantial profits over the years based on the diversion of opioids into Oklahoma County. The Distributor Defendants knew that Oklahoma County would be unjustly forced to bear the costs of these injuries and damages.

82.     The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids within Oklahoma County showed an intentional or reckless disregard for the safety of Oklahoma County and its residents. Their conduct poses a continuing threat to the health, safety, and welfare of Oklahoma County.

83.     The Distributor Defendants' violations constitute prima facie evidence of negligence.

## V.     CAUSES OF ACTION

### A.     Public Nuisance – 50 O.S. § 20

84.     Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

85.     Defendants, individually and acting through their employees and agents, and in concert with each other, have intentionally, recklessly, or negligently engaged in conduct or omissions which endanger or injury the property, health, safety and/or comfort

22

of a considerable number of persons in Oklahoma County by their production, promotion, and marketing of opioids for use by residents of Oklahoma County.

86. Under 50 O.S. § 20, the Board of County Commissioners for Oklahoma County (any county in this State with a population in excess of five hundred fifty thousand (550,000)) may declare what shall constitute a nuisance, and provide for the prevention, removal and abatement of nuisances.

87. Defendants' conduct, including but not limited to, the unlawful distribution and/or diversion of opioids, as set forth above, have created an opioid epidemic in Oklahoma County that constitutes a public nuisance. Defendants have created a condition that affects entire communities, neighborhoods, and considerable numbers of persons at the same time.

88. Defendants' distribution and/or diversion of opioids constitute unlawful acts and/or omissions of duties, which annoy, injure, or endanger the comfort, repose, health, and/or safety of others, and offend decency to a considerable number of persons in Oklahoma County. It has even caused deaths, serious injuries, and a severe disruption of public peace, order and safety.

89. Defendants have a duty to abate the nuisance caused by the prescription opioid epidemic.

90. Defendants have failed to abate the nuisance they created.

91. Defendants' conduct directly and proximately caused injury to Plaintiff and its residents.

92. As a direct result of Defendants' conduct, Oklahoma County and its residents have suffered actual injury and economic damages including, but not limited

23

to, significant expenses for police, emergency, health, prosecution, social services and other services, lost tax revenue, as well as injury and death of residents of Oklahoma County.

93. Defendants are liable to Oklahoma County for the costs borne by it as a result of the opioid epidemic and for the costs of abating the nuisance created by Defendants.

**B.    Negligence and Negligent Misrepresentation**

94. Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

95. Defendants had a legal duty to act with the exercise of ordinary care or skill to prevent injury to another.

96. Defendants breached this duty through their distributions of opioids and failure to divert opioids from illicit channels.

97. Defendants' repeated and continuing breach of their duty of care directly and proximately caused damage to Oklahoma County.

**C.    Civil Conspiracy**

98. Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

99. Defendants engaged in a civil conspiracy in their distribution and/or diversion of opioids into Oklahoma County.

100. Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein.

24

101.    Defendants' conspiracy, and Defendants' repeated and continuing actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

**D.    Unjust Enrichment**

102.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

103.    Defendants received a benefit in the form of billions of dollars in revenue from the distribution of prescription opioids to treat chronic pain.

104.    Defendants were aware they were receiving that benefit. Defendants' repeated and continuing conduct was designed to bring about that benefit.

105.    Defendants retained that benefit at the expense of Oklahoma County, who has borne, and who continues to bear, the economic and social costs of Defendants' scheme.

106.    It is inequitable for the Defendants to retain that benefit without paying for it.

107.    Oklahoma County is entitled to recover from Defendants' prescription opioid profits the amounts Oklahoma County has spent and will have to spend in the future to address the effects of Defendants' actions.

**E.    Punitive Damages**

108.    Plaintiff incorporates the allegations set forth above as if they were fully set forth herein.

251.    Defendants acted with malice, purposely, and intentionally.    At a minimum, Defendants engaged in the conduct alleged herein with a conscious disregard

25

for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm.

252. Plaintiff is entitled to punitive damages in addition to actual damages from Defendants.

## JURY TRIAL DEMAND

109. Plaintiff hereby requests a trial by jury.

## RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following relief:

1. Enter Judgment in favor of Plaintiff against each of Defendants awarding Plaintiff its actual damages for the damages caused by the opioid epidemic, including but not limited to: (1) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing treatment, counseling, and rehabilitation services; (3) costs for providing treatment of infants born with opioid-related medical conditions; (4) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; (5) costs associated with law enforcement and public safety relating to the opioid epidemic; and (6) costs associated with drug court and other resources expended through the judicial system.

2. Order that Defendants compensate Plaintiff for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic;

3. Order Defendants to fund an "abatement fund" for the purposes of abating the opioid nuisance;

26

4.        Enter judgment against Defendants requiring Defendants to pay punitive

damages;

5.        Enter judgment against Defendants awarding Plaintiff its reasonable

attorneys' fees, all costs and expenses, pre-judgment and post-judgment interest; and,

6.        All other such and further relief as this Court may deem just and proper.


Respectfully submitted,

MATTHEW J. SILL, OBA #21547
HARRISON C. LUJAN, OBA #30154
S. ALEX YAFFE, OBA #21063, Of Counsel
FULMER SILL
1101 N. Broadway Ave., Suite 102
Oklahoma City, OK 73103
Phone/Fax: 405-510-0077
msill@fulmersill.com
hlujan@fulmersill.com

*Attorneys for Plaintiff*

27